483 S.E.2d 789

SWINTON CREEK NURSERY and James M.
Futch, III, Respondents/Appellants,

v.

EDISTO FARM CREDIT, ACA, E. Lawton Huggins
and Jerry S. Bishop, of whom Edisto Farm
Credit, ACA, is, Appellant/Respondent.

No. 2642.

Court of Appeals of South Carolina.

Heard Feb. 4, 1997.

Decided March 10, 1997.

Rehearing Denied April 24, 1997.

428

Marvin C. Jones and Jennifer E. Duty, both of Bogoslow & Jones, Walterboro, for appellant/respondent.

G. Thomas Hill, of Hill, Hill & Hill, Ravenel, for respondents/appellants.

STILWELL, Judge.

This action arises out of a borrower-lender relationship. Swinton Creek Nursery, the borrower, was a wholesale plant nursery business in which James M. Futch, III, was a partner. Edisto Farm Credit ("EFC") was the lender. Futch and Swinton Creek (collectively, "Plaintiffs") brought this action against EFC, E. Lawton Huggins, and Jerry S. Bishop, alleging libel, slander, invasion of privacy, interference with contract, interference with prospective economic advantage, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and civil conspiracy. EFC was granted summary judgment solely on the intentional infliction of emotional distress theory. The remaining theories of recovery were preserved for trial.

At trial, at the close of Plaintiffs' case, the trial court directed a verdict for EFC on the theories of civil conspiracy, slander, and breach of implied covenant of good faith and fair dealing. In addition, the trial court, finding no evidence of any tortious action by Bishop, dismissed Bishop as a defendant in the case. Finally, at the close of EFC's case, the trial court directed a verdict in favor of the remaining defendants on the libel claim. Thus, only the claims of invasion of privacy, interference with contract, and interference with prospective economic advantage went to the jury.

The jury returned a verdict for defendants EFC and Huggins as to interference with contract and interference with prospective economic advantage, and for defendant Huggins on the claim of invasion of privacy, but found that EFC was liable to Futch for invasion of privacy in the amount of $55,000. Swinton Creek, Futch, and EFC appeal. We affirm in part and reverse in part.

## STATEMENT OF THE FACTS

### I. Borrower–Lender Relationship Between Swinton Creek and EFC

EFC made its first loan to Swinton Creek in November of 1989 in the amount of $30,000. Swinton Creek obtained the

loan through EFC's Summerville branch,[1] which was managed by defendant Jerry Bishop. When Swinton Creek became delinquent on its note, Futch went to Bishop to request that the entire outstanding balance, both principal and interest, be renewed. Bishop testified he informed Futch that he could not roll the entire balance over without additional security. Bishop testified he told Futch that Swinton Creek's inventory would be worth only "ten cents on the dollar" if EFC took possession of it. In contrast, Futch alleged Bishop stated that EFC could sell Swinton Creek's assets for "ten cents on the dollar" and still get its money back.

After this discussion, despite the loan's past-due status, EFC agreed to renew the $30,000 principal to be due May 1, 1991. In May of 1991, however, Futch and Swinton Creek again went into default. Because Bishop was out of the country, the Swinton Creek loan was handled by Furman Dukes and William West of EFC. Again, Futch and Swinton Creek requested that both the principal and the interest be rolled over without payment. Dukes told Futch that the loan was already scheduled for foreclosure and that Swinton Creek would have to either make payment or cooperate in a restructure of the loan to avoid legal action. Futch agreed to make a payment of $8,000 and work on a plan to liquidate the assets of the nursery to pay off Swinton Creek's debt with EFC.

## II. Sale of Assets

During this time, also in May of 1991, Futch was approached by Durwood Collins, Sr. ("Collins Sr.") whose son, Durwood Collins, Jr. ("Collins") was about to graduate from Trident Technical College with a degree in horticulture. Collins Sr. mentioned that his son was trying to get into the nursery business and might be interested in working for Futch and even possibly buying Swinton Creek's assets to start his own nursery operation.

---

1. EFC was formed by the merger of Edisto Production Credit Association and the Federal Land Bank of Columbia in April of 1991. Edisto Production Credit Association was itself the result of a recent merger of several production credit associations, including South Atlantic Production Credit Association. Swinton Creek's loan documents, because they originated prior to the 1991 merger, bear the name of South Atlantic Production Credit Association. However, from April of 1991 forward, the loans were handled by EFC.

During the summer of 1991, Collins began working with Futch and negotiating the assets sale. The parties eventually agreed Collins would purchase the nursery for $97,500. Consequently, Collins went to EFC's Walterboro branch seeking an $87,000 loan to finance the acquisition of the plant assets and nursery equipment, and provide him with some start-up capital. Defendant Lawton Huggins handled this potential loan and asked Collins to provide other required financial information, such as a personal financial statement, tax returns, and projected income statement.

After Collins provided the required documents, Huggins went to the Swinton Creek site to evaluate the assets Collins wanted to finance and use as collateral for the loan. Huggins had obtained from West the appraisal of Swinton Creek's inventory performed in April. Huggins testified that the purpose of obtaining West's appraisal was to enable Huggins to check the serial numbers on the equipment. Huggins further testified that, other than the appraisal, he neither asked for nor received any other information from the Swinton Creek file. Similarly, West testified that he sent nothing but the appraisal to Huggins.

Huggins's visit to Swinton Creek revealed that the nursery's inventory would have some value as collateral—perhaps $25,-000 to $30,000—and the nursery's equipment was in good condition and had been adequately maintained. However, Huggins observed that the rest of the operation was in a state of disrepair with a "season's growth" of weeds around the greenhouse area and the shade cloths down. Huggins further testified the operation did not appear to him to be a going economic concern.

Huggins testified that while he was visiting Swinton Creek, he and Futch had the opportunity to talk about Collins's proposed acquisition of Swinton Creek's assets. Huggins testified Futch asked him when Collins's loan would be closing and voluntarily told him he was anxious to close the deal because he had past-due obligations with both EFC and First Union National Bank. Futch denied having any such conversation with Huggins.

On September 10, 1991, Huggins wrote a letter to Collins concerning Collins's loan application. The letter was ad-

dressed to Collins and mailed first class to the address Collins provided on his loan application. The fourth paragraph of the letter stated:

I would like to address ... the weaknesses present due to your limited financial strength and questionable repayment capacity. Your limited asset base does not provide a tangible secondary source of repayment should the nursery fail to generate earnings as projected. In other words, you have no assets which may be converted in order to satisfy the obligation to my organization. This is extremely important since *the projected income for the nursery is not supported by a successful earnings trend. In fact, the operation you are purchasing has been under financial duress.* Your forecast for generating adequate earnings may materialize, however, there is adequate risk for concern on my part.

(Emphasis ours.)

Huggins testified he based his characterization of Swinton Creek as "under financial duress" solely on his observation of the nursery only days earlier and Futch's admission that he needed the loan to Collins to be closed quickly because he already had two notes past due. Huggins testified he had never received any other information on Swinton Creek and Futch other than the appraisal.

When Collins received the letter, he brought it to Futch and told him he would not be able to purchase the nursery for the amount they had discussed because he could not raise the necessary money. Collins testified he could not remember whether he showed the letter to anyone else prior to giving it to Futch, although he did testify that he spoke to Raymond Tumbleston, who was on EFC's board of directors, concerning the situation.

As a result of Huggins's letter, Futch testified he felt pressure to reduce his asking price and close the sale quickly because insurance needed to be procured for the plant stock, and the necessary insurance could not be. obtained after

October 1.[2]  He therefore told Collins in late September that he would reduce his price by $20,000.

Eventually, a number of factors allowed the loan to go through.  In addition to Futch's reduction in his asking price, Collins had his father sign as a co-applicant on the loan.  The loan was also transferred from EFC's Walterboro branch to its Summerville branch by EFC president Lynn Z. Danzler.  Futch himself also helped Collins obtain the loan when, upon receiving Huggins's letter from Collins, he contacted Jerry Smoak, an acquaintance and member of EFC's board of directors.  Futch showed Huggins's letter to Smoak, who in turn called Danzler to let him know Futch was upset about the letter.  Danzler then met Collins to try to find some way to rework his application.  They were able to do so, and the closing took place on October 17, 1991, at the Summerville branch, with Collins borrowing a total amount of $82,000, $77,500 of which represented the purchase price of the assets and inventory.  Futch's loan with EFC was liquidated from the proceeds and his stock in EFC was transferred to Collins.[3]

## INJURIES ALLEGED

Futch claimed to have sustained actual damages of $20,000, the amount by which he reduced his price.  The additional money, he claimed, was to have purchased a gemcutter's stock and allowed him to go into business as a jeweler.  He also testified that, while he made his 1991 payment on the First Union note from the proceeds of the sale, that $20,000 would have helped him make his 1992 payment on that note.  Instead, First Union rolled the note over in 1992, but in 1993 when Futch again failed to make his payment, First Union called the note and repossessed Futch's automobile.

Futch also claims that his personal relationships with businessmen and friends in his community were adversely affected by Huggins's letter.  In particular, Futch cited Raymond

---

2.  Futch testified that the deadline for purchasing the insurance might have been as late as November 1.

3.  When a borrower obtains a loan from EFC, a portion of the loan purchases stock in EFC.

Tumbleston and Jerry Smoak as friends who had been close but who snubbed him socially after this incident.[4]

## LAW/DISCUSSION

### EFC'S APPEAL

### I.

EFC argues on appeal that the trial court erred in denying its motions for directed verdict and for a new trial because Futch failed to introduce evidence supporting a finding of invasion of privacy, the sole cause of action on which the jury found for Plaintiffs. We agree.

In reviewing a directed verdict, the appellate court will view the evidence and all reasonable inferences in the light most favorable to the opposing party, but may not ignore facts unfavorable to that party. *Bultman v. Barber*, 277 S.C. 5, 281 S.E.2d 791 (1981).

In *Meetze v. Associated Press*, 230 S.C. 330, 95 S.E.2d 606 (1956), and *Todd v. South Carolina Farm Bureau Mutual Insurance Company*, 276 S.C. 284, 278 S.E.2d 607 (1981), our supreme court adopted the *American Jurisprudence* definition of what constitutes an actionable invasion of a right to privacy:

The unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities, in such manner as to

---

4. In addition, Futch testified that he was a member of the Charleston County Farm Bureau and was serving as president in 1991. He stepped down from his position in 1991 but testified that he expected to remain on the board of directors. However, when he inquired as to his room number for the Farm Bureau's December 1991 convention at Myrtle Beach, he was informed that no room had been reserved for him because he was no longer on the board. Jerry Smoak, who was also a member of the Farm Bureau board of directors, testified from the minutes of the September 10, 1991, Farm Bureau meeting wherein Futch "resigned his position as president and stated he is no longer in the agricultural business." Raymond Tumbleston testified that one of the requirements for service on the Farm Bureau board is that board members must have an interest in agriculture. Essentially, testified Tumbleston, Futch resigned from his position because he no longer had an interest in agriculture.

outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

*Meetze,* 230 S.C. at 335, 95 S.E.2d at 608; *Todd* 276 S.C. at 291, 278 S.E.2d at 610.

■ Clearly, in this case, the only applicable branch of the tort of invasion of privacy is "the publicizing of one's private affairs with which the public has no legitimate concern." "The gravamen [of this branch] of the tort [of invasion of privacy] is publicity as opposed to mere publication." *Snakenberg v. Hartford Casualty Ins. Co.,* 299 S.C. 164, 170, 383 S.E.2d 2, 6 (Ct.App.1989).

The distinction between publication and publicity is explained in *Harrison v. Humble Oil & Refining Co.,* 264 F.Supp. 89 (D.S.C.1967), which was in turn cited by this court in *Rycroft v. Gaddy,* 281 S.C. 119, 314 S.E.2d 39 (Ct.App. 1984):

> Some limits of this branch of the right of privacy appear to be fairly well marked out. The disclosure of the private facts must be a public disclosure, and not a private one; there must be, in other words, publicity. It is an invasion of his rights to publish in a newspaper that the plaintiff does not pay his debts, or to post a notice to that effect in a window on the public street, or to cry it aloud in the highway, but not to communicate the fact to the plaintiff's employer or to any other individual, or even to a small group, unless there is some breach of contract, trust or confidential relation which will afford an independent basis for relief.

*Harrison,* 264 F.Supp. at 92 (quoting William L. Prosser, Law of Torts 834–35 (3d ed. 1963) (citations omitted).

■ Here, because the only evidence of EFC's dissemination of the information concerning Futch's financial problems was EFC's letter to Collins, no evidence supported Plaintiffs' claim that EFC publicly disclosed the information. Plaintiffs suggest that Collins may have communicated the information in the letter to other people. Even assuming he did, that does not change the fact that EFC communicated the information to Collins only.

Plaintiffs, citing *Rycroft,* also argue they did not need to prove publicity to prove invasion of privacy since EFC's communication breached its confidential relationship with Futch. That is incorrect. *Rycroft* specifically states that *public* disclosure is an essential element:

> Under a cause of action for the 'publicizing of one's private affairs with which the *public* has no legitimate concern' . . . an essential element of recovery is a showing of a *public disclosure* of private facts. *Beard v. Akzona, Inc.,* 517 F.Supp. 128 (E.D.Tenn.1981). The disclosure of private facts must be a public disclosure, and not a private one; there must be, in other words, publicity. *Harrison v. Humble Oil,* 264 F.Supp. 89 (D.S.C.1967). It is publicity, as opposed to publication, that gives rise to a cause of action for invasion of privacy. *Tureen v. Equifax, Inc.,* 571 F.2d 411 (8th Cir.1978); *Todd v. S.C. Farm Bureau,* supra. Communication to a single individual or to a small group of people, absent a breach of contract, trust, or other confidential relationship, will not give rise to liability. *Harrison v. Humble Oil,* supra; *Beard v. Akzona, Inc.,* supra; *Tureen v. Equifax, Inc.,* supra; *Peacock v. Retail Credit Co.,* 302 F.Supp. 418 (N.D.Ga.1969), aff'd 429 F.2d 31 (5th Cir.1970).

*Rycroft,* 281 S.C. at 124, 314 S.E.2d at 43 (emphasis in original). Although Plaintiffs urge that the last sentence in the above passage supports their position, we disagree. When read in the context of the sentences directly preceding it stating that publicity is an essential element of invasion of privacy, it is apparent that the "liability" referred to is legal liability in general, rather than liability for the tort of invasion of privacy.

A review of *Harrison,* the first case cited in *Rycroft* to support the sentence in question, also supports that interpretation. In *Harrison,* the rule is stated that it is not an invasion of the plaintiff's "rights" to communicate private information to an "individual, or even to a small group, unless there is some breach of contract, trust or confidential relation which will afford an *independent basis* for relief." 264 F.Supp. at 92 (citing Prosser, *supra,* at 834–35) (emphasis added). Accordingly, because there was no evidence EFC *publicly* disclosed Futch's financial information, the trial court

erred in allowing the invasion of privacy cause of action to go to the jury.[5]

### Futch and Swinton Creek's Appeal

#### I.

Plaintiffs first argue the trial court erred in granting EFC's motion for directed verdict as to libel. We disagree.

■  In a defamation action, if the defendant proves qualified privilege, the plaintiff may not recover unless he overcomes the privilege by proving actual malice. *Bell v. Bank of Abbeville,* 208 S.C. 490, 494–95, 38 S.E.2d 641, 643 (1946); ("[A] privileged communication is an exception to the rule [that malice will be presumed where the offending statement is actionable *per se* ]."); 50 Am.Jur.2d *Libel and Slander* § 276 (1995) ("Once the defendant has proved that he or she is entitled to a qualified privilege, there arises a rebuttable presumption of good faith that may constitute a complete defense. That is, such privilege merely rebuts the malice implied by law, and makes a showing of falsity and actual malice essential to the right of recovery.") (citations omitted).

■  "The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." *Conwell v. Spur Oil Co.,* 240 S.C. 170, 178–79, 125 S.E.2d 270, 275 (1962).

■  "Actual malice" means that the defendant acted "with ill-will towards the plaintiff, or that it acted recklessly or wantonly, meaning with conscious indifference toward plaintiff's rights," and requires that "at the time of his act or omission to act the tort-feasor be conscious, or chargeable with consciousness of his wrongdoing." *Padgett v. Sun News,* 278 S.C. 26, 32, 292 S.E.2d 30, 34 (1982).

■  Here, the trial court correctly found as a matter of law that EFC established the existence of a qualified privilege and

5. Because we reverse on this ground, we do not address EFC's remaining arguments.

Plaintiffs failed to prove actual malice. Collins had applied for a loan from EFC, proposing that the business he sought to purchase would serve as security. When EFC concluded those assets would not sufficiently secure the loan, it was only logical that it explain that fact to Collins so that he could seek additional security, which he eventually did. There was no evidence presented that EFC had any motive to disrupt Futch's sale of Swinton Creek to Collins or that EFC communicated with Collins in any improper manner. In short, all of the evidence presented pointed to the conclusion that EFC, by writing the letter to Collins, merely sought to protect its and Collins's mutual interest in obtaining adequate security for the loan. The trial court was therefore correct to direct a verdict on the libel cause of action.

## II.

Plaintiffs also contend the trial court erred in directing a verdict against them on their civil conspiracy claim.

According to South Carolina common law, a civil conspiracy consists of three elements: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) which causes him special damage. *Vaught v. Waites*, 300 S.C. 201, 387 S.E.2d 91 (Ct.App.1989). Allegation of an unlawful act is not required to state a cause of action for civil conspiracy, although a civil conspiracy may be furthered by an unlawful act. An action for civil conspiracy may exist even though defendants committed no unlawful act and no unlawful means were used. Thus, lawful acts may become actionable as a civil conspiracy when the "object is to ruin or damage the business of another." *LaMotte v. Punch Line of Columbia, Inc.*, 296 S.C. 66, 70, 370 S.E.2d 711, 713 (1988).

Having closely reviewed the record, we find no evidence that would give rise to a conspiracy cause of action. Although Plaintiffs argue Bishop may have had a motive to injure Futch as a result of a disagreement Bishop and Futch once had concerning Futch's request to restructure his loan, in the absence of further motive on the part of Bishop or

Huggins or other evidence suggesting actual wrongdoing, the trial court was correct in finding the evidence was not sufficient to send the conspiracy cause of action to the jury.[6]

### III.

Plaintiffs finally argue that the trial court erred in granting EFC's motion for directed verdict on Plaintiffs' cause of action for breach of implied covenant of good faith. We disagree.

There exists in every contract an implied covenant of good faith and fair dealing. *Commercial Credit Corp. v. Nelson Motors, Inc.*, 247 S.C. 360, 147 S.E.2d 481 (1966). However, "one who seeks to recover damages for breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was, at the appropriate time, able, ready and willing to perform it." *Parks v. Lyons*, 219 S.C. 40, 48, 64 S.E.2d 123, 126 (1951).

The evidence was uncontradicted that Futch failed to make the payment on his 1991 note with EFC according to its terms and that the note went into default in May of that year. Although Plaintiffs claim the loan was later restructured, no evidence in the record supports that assertion. Because Plaintiffs failed to present evidence creating a reasonable inference that they had performed their part of the contract, the trial court was correct to direct a verdict against them on their breach of contract cause of action.

**AFFIRMED IN PART AND REVERSED IN PART.**

HEARN and HOWARD, JJ., concur.

---

**6.** For these same reasons, we disagree with Plaintiffs' arguments that the trial court erred in disallowing the issue of punitive damages to be submitted to the jury. *See Jones v. Garner*, 250 S.C. 479, 488, 158 S.E.2d 909, 914 (1968) ("While implied malice will support an award of actual damages, punitive damages cannot be recovered in the absence of proof of actual malice.").