514 S.E.2d 126

**SWINTON CREEK NURSERY and James M. Futch III, Petitioners,**

v.

**EDISTO FARM CREDIT, ACA, E. Lawton Huggins and Jerry S. Bishop, Defendants,**

of whom Edisto Farm Credit, ACA, is Respondent.

No. 24910.

Supreme Court of South Carolina.

Heard Jan. 7, 1999.
Decided March 1, 1999.

470

472

G. Thomas Hill, of Hill, Hill & Hill, of Johns Island, for petitioners.

Marvin C. Jones and Jennifer E. Duty, of Bogoslow & Jones, P.A., of Walterboro, for respondent.

TOAL, Justice:

In this case, we granted a petition for a writ of certiorari to review the Court of Appeals' opinion in *Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 326 S.C. 426, 483 S.E.2d 789 (Ct.App.1997). We affirm in part, reverse in part, and remand.

### FACTUAL/PROCEDURAL BACKGROUND

In 1980, James M. Futch, III, ("Owner") began a nursery business near the small town of Hollywood, South Carolina.[1] As a result of his efforts, Owner created the Swinton Creek Nursery ("Swinton Creek"). Swinton Creek was mainly a wholesale operation that sold azaleas to such stores as Wal–Mart and K–Mart.

---

1. Owner's mother was also a partner in the nursery and helped with operating the business.

In an effort to expand the nursery, Owner borrowed $30,000 from the South Atlantic Production Credit Association in November 1989. In April of 1991, South Atlantic Production Credit merged with several other credit associations to become the Edisto Farm Credit ("EFC"). From April 1991 forward, Owner's loan was handled by EFC. Owner obtained his initial loan from EFC's Summerville branch, which was managed by Jerry Bishop. As a borrower, Owner also became a stockholder of EFC.[2]

In July of 1989, Owner became delinquent on his note with EFC. Bishop requested that Owner pay the interest on the loan.[3] Owner subsequently went to see Bishop at his office in Summerville to discuss the default. EFC ultimately agreed to renew the $30,000 principal on Owner's note to be due May 1, 1991. However, in May, Owner again went into default. Owner agreed to make a payment of $8,000 and work on a plan to liquidate the assets of the nursery to pay off his debt to EFC.

In late May of 1991, Owner encountered Durwood Collins, Sr., in a convenience store on Edisto Island. Collins owned the pavilion at Edisto Beach and had known Owner since they were children. Owner told Collins that he was thinking of liquidating or down-sizing some of Swinton Creek. Collins told Owner that his son, Durwood Collins, Jr., ("Buyer") was graduating from college and was interested in the nursery business. Collins asked Owner if he was interested in selling all of Swinton Creek. Owner said no, but he would sell some of Swinton Creek's assets and equipment to Buyer.

During the summer of 1991, Buyer began working for Owner at Swinton Creek to learn the nursery business.[4] Buyer also began negotiations with Owner concerning the sale

---

2. Owner's rights as a member of EFC included voting for the board of directors, sharing in the profits and earnings of the association, and applying for loans.

3. Owner eventually complied, paying $2,404.10 for interest that had accrued through February 27, 1990.

4. Buyer now operates Milton Creek Nursery on Edisto Island.

of Swinton Creek's assets. Owner and Buyer agreed on a price of $97,500.[5]

In August of 1991, Buyer went with his father to EFC's Walterboro office seeking a loan for the acquisition of Swinton Creek's assets and equipment. E. Lawton Huggins was the senior loan officer at the Walterboro branch and handled Buyer's loan application for EFC. As part of the application process, Buyer provided Huggins with his financial statement, tax returns, and a projected income statement of his proposed nursery.

In early September of 1991, Huggins received an appraisal of Swinton Creek's equipment and nursery stock from William West, an EFC appraiser. Huggins subsequently visited Swinton Creek to look at the equipment and nursery stock and to re-check the serial numbers on West's appraisal. Huggins testified he had a "side bar conversation" with Owner while visiting Swinton Creek. Huggins stated that Owner inquired as to the time table for closing and indicated that time was of the essence because he had other pressing financial obligations, including a past due loan. Owner conceded Huggins visited Swinton Creek, but denied having the "side bar conversation" with him at the nursery.

On September 10, 1991, Huggins wrote a letter to Buyer concerning Buyer's loan application. The fourth paragraph of the letter stated:

I would like to address ... the weaknesses present due to your limited financial strength and questionable repayment capacity. Your limited asset base does not provide a tangible secondary source of repayment should the nursery fail to generate earnings as projected. In other words, you have no assets which may be converted in order to satisfy the obligation to my organization. *This is extremely important since the projected income for the nursery is not supported by a successful earnings trend. In fact, the operation you are purchasing has been under financial duress.* Your forecast for generating adequate earnings may materialize, however, there is adequate risk for concern on my part.

---

5. This price included a truck which Owner agreed to sell for $12,500.

Huggins testified that, in the letter, the "earning trend" comment was in reference to *Buyer's* projected income for the nursery. Huggins claimed he had no knowledge of Swinton Creek's earning trend and was only referring to *Buyer's* trend. However, Huggins admitted the "financial duress" comment was in reference to Swinton Creek. Huggins testified his comment was based solely on his observations during his visit at Swinton Creek and his conversation with Owner. Huggins further testified the letter was sent first class mail to Buyer and was not copied to anyone else.

After receiving the letter, Buyer went to see Owner and explained that he would be unable to purchase the assets of the nursery for the amount they had originally agreed on. Buyer showed Owner the letter from Huggins and told Owner that he did not believe he would be able to come up with the money. Buyer eventually obtained a loan from EFC's Summerville branch [6] and purchased the Swinton Creek assets for $77,500—$20,000 less than originally agreed on.[7]

Owner sued EFC, Huggins, and Bishop, alleging libel, slander, invasion of privacy, interference with contract, interference with prospective economic advantage, intentional infliction of emotional distress, breach of implied covenant of good faith and fair dealing, and civil conspiracy. Before trial, the trial court granted EFC's motion for summary judgment on the intentional infliction of emotional distress claim. The other claims were preserved for trial.

At the close of plaintiff's case, the trial court directed a verdict for EFC on the theories of civil conspiracy, slander, and breach of implied covenant of good faith and fair dealing. In addition, the trial court, finding no evidence of tortious action by Bishop, dismissed Bishop as a defendant in the case. At the close of all the evidence, the trial court directed a verdict in favor of the remaining defendants on the libel claim.

---

6. Buyer's loan application was transferred from EFC's Walterboro branch to the Summerville branch where it was handled by Lynn Danzler. The loan application was approved after Buyer's father co-signed the loan.

7. The closing date for the purchase was October 17, 1991. Owner testified he felt pressure to close the deal because he needed to buy insurance before November.

Thus, only the claims of invasion of privacy, interference with contract, and interference with prospective economic advantage went to the jury.

The jury returned a verdict for defendants EFC and Huggins as to the claims of interference with contract and interference with prospective economic advantage, and for defendant Huggins on the claim of invasion of privacy, but found that EFC was liable to Owner for invasion of privacy in the amount of $55,000. Both Owner and EFC appealed. EFC argued the trial court erred by not granting its directed verdict motion on the invasion of privacy claim. Owner, on the other hand, argued the trial court should not have granted directed verdicts on his claims for libel, civil conspiracy, and breach of implied covenant of good faith and fair dealing. The Court of Appeals ruled in favor of EFC on all arguments; the court reversed the trial court's failure to direct a verdict on the invasion of privacy claim and affirmed the directed verdicts on the other claims. *Swinton Creek Nursery v. Edisto Farm Credit, ACA,* 326 S.C. 426, 483 S.E.2d 789.

We granted Owner's petition for a writ of certiorari to consider the following issues:

(1) Did the Court of Appeals err in reversing the trial court's denial of EFC's motion for directed verdict on the invasion of privacy claim?

(2) Did the Court of Appeals err in affirming the trial court's grant of EFC's motion for directed verdict on the libel claim?

(3) Did the Court of Appeals err in affirming the trial court's grant of EFC's motion for directed verdict on the breach of implied covenant of good faith and fair dealing claim?

### LAW/ANALYSIS

■ In ruling on a motion for directed verdict, a court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Quesinberry v. Rouppasong,* 331 S.C. 589, 503 S.E.2d 717 (1998); *Gamble v. International Paper Realty Corp.,* 323 S.C. 367, 474 S.E.2d 438 (1996). When the evidence yields only one inference, a directed verdict in favor of the moving party is proper. *Id.*

The trial court can only be reversed by this Court when there is not evidence to support the ruling below. *Creech v. South Carolina Wildlife & Marine Resources Dep't,* 328 S.C. 24, 491 S.E.2d 571 (1997).

## A. INVASION OF PRIVACY

Owner argues that the Court of Appeals erred in reversing the trial court's denial of EFC's directed verdict motion on his invasion of privacy claim. We disagree.

The origins of the tort of invasion of privacy are found in the famous law review article written in 1890 by Samuel D. Warren and Louis D. Brandeis. *See* Warren & Brandeis, *The Right to Privacy,* 4 Harv.L.Rev. 193 (1890).[8] In their article, Warren and Brandeis advocated an extension of common law privacy rights to protect individuals from what they saw as the advancing threat of a gossip-consumed, technological society. *See* Jonathan P. Graham, Note, *Privacy, Computers, and the Commercial Dissemination of Personal Information,* 65 Tex. L.Rev. 1395, 1405 (1987) ("Warren and Brandeis found the legal basis for the right to privacy by coupling common-law doctrines with the notion that technological advances and social changes had made it necessary to recognize the new right."). Warren and Brandeis warned of new mechanical devices which "threaten[ed] to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'" Warren & Brandeis, 4 Harv.L.Rev. at 195. They therefore called for securing to the individual the right "to be let alone." [9] *Id.*

In *Holloman v. Life Insurance Co. of Virginia,* 192 S.C. 454, 7 S.E.2d 169 (1940), this Court for the first time recognized the tort of invasion of privacy, stating, "the right to privacy is correctly defined . . . as the right to be let alone;

---

**8.** For a critical discussion of the Warren–Brandeis formulation *see* Diane L. Zimmerman, *Requiem For A Heavyweight: A Farewell to Warren and Brandeis's Privacy Tort,* 68 Cornell L.Rev. 291 (1983).

**9.** In 1960, Dean Prosser expanded upon the Warren–Brandeis discourse by classifying invasion of privacy into four distinct causes of action. *See* Prosser, *Privacy,* 48 Cal.L.Rev. 383 (1960). Prosser's classifications were incorporated into and elaborated upon in the Restatement.

the right of a person to be free from unwarranted publicity." *Holloman,* 192 S.C. at 458, 7 S.E.2d at 171 (citation omitted). Later, in *Meetze v. Associated Press,* 230 S.C. 330, 95 S.E.2d 606 (1956), this Court specified three distinct causes of action for invasion of privacy:

> ■ The unwarranted appropriation or exploitation of one's personality, [2] the publicizing of one's private affairs with which the public has no legitimate concern, or [3] the wrongful intrusion into one's private activities, in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

*Meetze,* 230 S.C. at 335, 95 S.E.2d at 608 (quoting 41 Am.Jur. *Privacy* § 2); *see Todd v. South Carolina Farm Bureau Mut. Ins.,* 276 S.C. 284, 278 S.E.2d 607 (1981). The Court in *Meetze* further noted that truth is not a defense to an action for invasion of privacy. *Id.*

■ Owner concedes his claim falls under the second cause of action specified in *Meetze.* The elements of this tort include (1) publicizing, (2) absent any waiver or privilege, (3) private matters in which the public has no legitimate concern, (4) so as to bring shame or humiliation to a person of ordinary sensibilities. *See Meetze, supra; Tureen v. Equifax, Inc.,* 571 F.2d 411 (8th Cir.1978). The Court of Appeals concluded the trial court should have granted EFC's directed verdict motion because Owner's private affairs had not been "publicized." *Swinton Creek,* 326 S.C. at 435, 483 S.E.2d at 795.

With regard to Owner's right of privacy claim, the two issues raised by this appeal are: (a) whether the publicity element of this cause of action can be satisfied by mere publication; and (b) whether publicity must be shown if there is also a breach of confidential relationship.

### 1. Publicity

■ Though never directly addressed by this Court, our Court of Appeals has consistently held that publicity, as opposed to mere publication, is what is required to give rise to a cause of action for this branch of invasion of privacy;

communication to a single individual or to a small group of people will not give rise to an invasion of privacy claim.[10] *See* *McCormick v. England,* 328 S.C. 627, 494 S.E.2d 431 (Ct.App. 1997); *Swinton Creek, supra; Snakenberg v. Hartford Cas. Ins. Co., Inc.,* 299 S.C. 164, 383 S.E.2d 2 (Ct.App.1989); *Wright v. Sparrow,* 298 S.C. 469, 381 S.E.2d 503 (Ct.App. 1989); *Rycroft v. Gaddy,* 281 S.C. 119, 314 S.E.2d 39 (Ct.App. 1984).[11] By defining "publicity" in this manner, our Court of Appeals is in line with the majority of other jurisdictions.[12] *See* Robert C. Post, *The Social Foundations of Privacy: Community and Self In The Common Law Tort,* 77 Cal. L.Rev. 957 (1989). Many of these courts have borrowed

---

**10.** One commentator has suggested that this requirement ensures that public communications comply with minimum standards of civility, while liberating private communications from the threat of legal enforcement of such restraints. Robert C. Post, *The Social Foundations of Privacy: Community and Self In The Common Law Tort,* 77 Cal.L.Rev. 957 (1989).

**11.** In *Rycroft, supra,* the Court of Appeals borrowed this interpretation directly from the federal district court decision in *Harrison v. Humble Oil,* 264 F.Supp. 89 (D.S.C.1967). In *Harrison,* the plaintiff alleged that defendant's communication to plaintiffs employer regarding a debt owed to defendant constituted an invasion of privacy. The court, in finding no invasion of privacy, stated:

> It is an invasion of his rights to publish in a newspaper that the plaintiff does not pay his debts, or to post a notice to that effect in a window on the public street, or to cry it aloud in the highway, *but not to communicate the fact to the plaintiff's employer or to any other individual, or even a small group....*

*Harrison,* 264 F.Supp. at 92 (emphasis added) (quoting Prosser, Law of Torts, *Right of Privacy* § 112 at 835 (3d ed. 1963)).

**12.** *E.g., Tureen v. Equifax, Inc.,* 571 F.2d 411, 418 (8th Cir.1978) ("Except in cases of physical intrusion, it has been held that the tort must be founded upon publicity, in the sense of communication to the public in general or to a large number of persons, as distinguished from one individual or a few."); *Satterfield v. Lockheed Missiles and Space Co., Inc.,* 617 F.Supp. 1359, 1370 (D.S.C.1985) ("The disclosure of private facts must be a public disclosure, and not a private one; there must be, in other words, publicity."); *Beard v. Akzona, Inc.,* 517 F.Supp. 128, 133 (E.D.Tenn.1981) ("'Publicity' ... means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."); *Werner v. Kliewer,* 238 Kan. 289, 710 P.2d 1250, 1256 (1985) ("it is not an invasion of the right of privacy ... to communicate a [private fact] to a single person or even to a small group of persons.").

directly from the Restatement (Second) of Torts, which contains the following discussion of "publicity:".

> The form of invasion of the right of privacy covered in this Section depends upon publicity given to the private life of the individual. "Publicity," as it is used in this Section, differs from "publication," as that term is used in sec. 577 in connection with liability for defamation. "Publication," in that sense, is a word of art, which includes any communication by the defendant to a third person. "Publicity," on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.
>
> Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication.

The Restatement (Second) of Torts, § 652D cmt. a, at 383 (1977).

In the instant case, the trial court, in denying EFC's motion for a directed verdict, stated: "The plaintiff testified that various people had confronted him about it, and again, obviously, there is a—I grant you, there is a strong question as to how it got out to anybody ... but there is enough there, I think, that it would be a jury issue." At trial, William Geraty testified that the word on the street was that Owner was having problems with a bank. Owner also testified that numerous people had questioned him about the letter. As an

example, Owner stated that Nat Sanders, Bishop's cousin, asked him about it once. Sanders did not testify at trial.

In their article, *The Right to Privacy*, Warren and Brandeis were primarily concerned with new mechanical devices that would catapult once private gossip into the public domain. *See* Warren & Brandeis, 4 Harv.L.Rev. at 196 ("When personal gossip attains the dignity of print, and crowds the space available for matters of real interest to the community, what wonder that the ignorant and thoughtless mistake its relative importance."). They clearly did not advocate abolishing entirely *personal* correspondences, whether written or oral. As originally conceived by Warren and Brandeis, public disclosure of private facts requires disclosure akin to publications in mass-media. In the instant case, there is no evidence that EFC published the contents of the letter to anyone other than Buyer. The letter was sent only to Buyer in an attempt to address his loan application. We find no evidence to support a claim for public disclosure of private facts.

Owner nevertheless argues that EFC should be liable for "sparking the flame" of publicity. In other words, even if EFC published the statement to only one person, if the information eventually became public, EFC should be held accountable. However, such an approach would effectively eviscerate the requirement that the *defendant* be the one to have publicized the private information. If this approach were adopted, almost any form of gossip would be actionable, regardless of the discretion taken in its initial communication. We therefore affirm the Court of Appeals on this issue.

## 2. Confidential Relationship

In *Rycroft v. Gaddy*, 281 S.C. 119, 314 S.E.2d 39 (Ct.App.1984), the Court of Appeals held, "Communication to a single individual or to a small group of people, *absent a breach of contract, trust or other confidential relationship*, will not give rise to liability." *Rycroft*, 281 S.C. at 124, 314 S.E.2d at 43 (emphasis added). Based on this language, Owner argues that a plaintiff need not prove publicity in an invasion of privacy claim if there is a breach of contract, trust, or other confidential relationship. We disagree.

Recently, in *McCormick v. England*, 328 S.C. 627, 494 S.E.2d 431 (Ct.App.1997), our Court of Appeals held: "'A confidential relationship is breached if unauthorized disclosure is made to only one person not a party to the confidence, *but the right of privacy does not cover such a case.*'" *McCormick*, 328 S.C. at 641, 494 S.E.2d at 438 (emphasis added) (quoting Alan B. Vickery, Note, *Breach of Confidence: An Emerging Tort*, 82 Colum.L.Rev. 1426, 1442 (1982)). Under this view, breach of contract or confidentiality does *not* give rise to an exception to the "publicity" requirement for the tort of invasion of privacy.

In the instant case, the Court of Appeals observed that the language in *Rycroft, supra*, derived from the federal district court case of *Harrison v. Humble Oil*, 264 F.Supp. 89 (D.S.C. 1967). *Harrison*, in turn, quoted from Prosser's third edition of the Law of Torts. *See* Prosser, Law of Torts, *Right of Privacy* § 112 at 835 (3d ed. 1963). The court emphasized that *Harrison* and Prosser described "breach of contract, trust or other confidential relationship" as an "independent basis" of relief. In other words, though the facts of a case may give rise to a breach of contract or confidentiality claim, that does not excuse the requirement that the private information be "publicized" in order to maintain an invasion of privacy claim.

We agree with the Court of Appeals' interpretation on this point. In their article, Warren and Brandeis characterized the relationship between breach of contract or confidentiality and invasion of privacy in the following manner:

This process of implying a term in a contract, or of implying a trust (particularly where the contract is written, and where there is no established usage or custom), is nothing more nor less than a judicial declaration that public morality, private justice, and general convenience demand the recognition of such a rule, and that the publication under similar circumstances would be considered an intolerable abuse.... But the court can hardly stop there. The narrower doctrine may have satisfied the demands of society at a time when the abuse to be guarded against could rarely have arisen without violating a contract or a special

confidence; but now that modern devices afford abundant opportunities for the preparation of such wrongs without any participation by the injured party, the protection granted by law must be placed upon a broader foundation [of invasion of privacy].

Warren & Brandeis, 4 Harv.L.Rev. at 210–11.

Although related in policy, breach of confidentiality and invasion of privacy are not so closely connected in law that the presence of the former obviates proof of "publicity" in the latter.[13] Warren and Brandeis envisaged a privacy right that would occupy ground not already covered by contract and confidentiality theories. In this sense, if a plaintiff has a claim for breach of contract or confidentiality, there is no justification for reviving an otherwise invalid invasion of privacy claim.[14] We therefore affirm the Court of Appeals on this issue.

## B. DEFAMATION

Owner argues the trial court erred in granting EFC's motion for a directed verdict concerning his defamation claim. We agree.

---

**13.** *See* Joseph Glenn White, Note, *Physician's Liability for Breach of Confidentiality: Beyond The Limitations of The Privacy Tort*, 49 S.C.L.Rev. 1271 (1998) (distinguishing between breach of confidentiality and invasion of privacy and arguing the former is better equipped to protect patients from the disclosure of personal facts by their doctors).

**14.** Additionally, breach of confidentiality and invasion of privacy are torts that encompass different doctrinal limitations. *See* Vickery, 82 Colum.L.Rev. at 1440 ("Privacy's doctrinal limits are ... unnecessary in breach-of-confidence situations, and should not bar recovery to plaintiffs deserving of a remedy."). For instance, "[d]isclosure in breach of confidence or other duty may cover greater ground than a pure privacy case, since the duty of confidence ... may include facts that are not 'private' in the ordinary sense and the disclosure may not be 'public.'" Prosser & Keeton, Law of Torts, *Right of Privacy* § 117, at 121, n. 6.5 (Supp.1988). Moreover, unlike breach of confidentiality, the privacy standard focuses on the *content* of the publication, rather than its *source*. *See McCormick*, 328 S.C. 627, 494 S.E.2d 431. Thus, it is irrelevant in a breach of confidentiality claim whether the disclosure of the information would bring shame to a person of ordinary sensibilities.

At trial, EFC moved for a directed verdict on Owner's defamation claim, arguing it was protected by a qualified privilege. The trial court granted the motion. The Court of Appeals affirmed the trial court's ruling.

 The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. *Holtzscheiter v. Thomson Newspapers, Inc.*, 332 S.C. 502, 506 S.E.2d 497 (1998). Defamatory communications take two forms: libel and slander. Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct. *Id.* If a communication is libelous, then the law presumes the defendant acted with common law malice. *Id.*

 In a defamation action, the defendant may assert the affirmative defense of conditional or qualified privilege. Under this defense, one who publishes defamatory matter concerning another is not liable for the publication if (1) the matter is published upon an occasion that makes it conditionally privileged, and (2) the privilege is not abused. Restatement (Second) of Torts, § 593 (1977); *see Bell v. Bank of Abbeville*, 208 S.C. 490, 38 S.E.2d 641 (1946). In *Bell*, this Court held:

> In determining whether or not the communication was qualifiedly privileged, regard must be had to the occasion and to the relationship of the parties. When one has an interest in the subject matter of a communication, and the person (or persons) to whom it is made has a corresponding interest, every communication honestly made, in order to protect such common interest, is privileged by reason of the occasion. The statement, however, must be such as the occasion warrants, and must be made in good faith to protect the interests of the one who makes it and the persons to whom it is addressed.

*Bell*, 208 S.C. at 493–94, 38 S.E.2d at 643. Where the occasion gives rise to a qualified privilege, there is a prima facie presumption to rebut the inference of malice, and the burden is on the plaintiff to show actual malice or that the scope of the privilege has been exceeded. *Fulton v. Atlantic Coast*

*Line R. Co.,* 220 S.C. 287, 67 S.E.2d 425 (1951); 53 C.J.S. *Libel and Slander* § 79 (1987).

■ To prove actual malice, the plaintiff must show that the defendant was activated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff; or that the statements were published with such recklessness as to show a conscious disregard for plaintiffs rights. *Holtzscheiter, supra.* In addition, "the person making [the defamatory statement] must be careful to go no further than his interests or his duties require.... And the fact that a duty, a common interest, or a confidential relation existed to a limited degree, is not a defense, even though the publisher acted in good faith." *Fulton,* 220 S.C. at 297, 67 S.E.2d at 429; *accord Woodward v. South Carolina Farm Bureau Ins. Co.,* 277 S.C. 29, 282 S.E.2d 599 (1981).

In general, the question whether an occasion gives rise to a qualified or conditional privilege is one of law for the court. 50 Am.Jur.2d *Libel and Slander* § 276 (1995). However, the question whether the privilege has been abused is one for the jury. *Id.* Factual inquiries, such as whether the defendants acted in good faith in making the statement, whether the scope of the statement was properly limited in its scope, and whether the statement was sent only to the proper parties, are generally left in the hands of the jury to determine whether the privilege was abused. *Id.; see also* Restatement (Second) of Torts §§ 599–610. In *Fulton,* this Court held that it was a question for the jury to determine if the publication went beyond what the occasion required and was unnecessarily defamatory. *Fulton,* 220 S.C. at 297, 67 S.E.2d at 429; *cf. Woodward,* 277 S.C. at 32–33, 282 S.E.2d at 601 ("While abuse of privilege is ordinarily an issue for the jury, ... in the absence of a controversy as to the facts ... it is for the court to say in a given instance whether or not the privilege has been abused or exceeded.").

■ In the instant case, the defamatory communication took the form of libel. Thus, malice was presumed, and it was defendant's burden to establish that a privilege existed in order to rebut this presumption. When Huggins was asked

why he made the "financial duress" comment, he stated: "I felt like it was part of my responsibility to an inexperienced applicant, who obviously could not see the risk associated with enterprise in which he was beginning." In granting the directed verdict as to conditional privilege, the trial court made the following conclusions: first, there was no evidence that Huggins wrote the letter in bad faith; second, EFC was trying to protect its own interest in the letter; third, the letter was written for the limited purpose of assisting Buyer with obtaining a loan; and fourth, the comments were made on the proper occasion and in the proper manner. The Court of Appeals affirmed the trial court's determination that, as a matter of law, the occasion gave rise to a conditional privilege and the privilege was not abused.

Assuming the occasion did give rise to a conditional privilege, we believe a question existed for the jury as to whether the privilege was exceeded or abused. First, the scope of the privilege extended only as far as EFC's interests and duties required. *See Fulton, supra.* It is questionable whether a specific comment about Swinton Creek's financial status was required to protect any interest or duty covered by the privilege. EFC contends it wrote the letter for the sole purpose of guiding Buyer into a successful loan application. Yet, Buyer was only seeking to buy some of Owner's assets, not the entire Swinton Creek operation. Moreover, if EFC wanted to convey to Buyer the difficulties of running a nursery in a small town, it could have simply made a general statement without specifically referring to Owner. Thus, even if EFC acted in good faith to assist Buyer, the jury might conclude that the "financial duress" comment was unnecessarily defamatory under these circumstances.

Additionally, there was evidence suggesting EFC acted in reckless disregard of Owner's rights so as to constitute actual malice. *See Holtzscheiter, supra.* Huggins testified that the financial duress comment was based solely on his observations of Swinton Creek and his "side bar conversation" with Owner. However, Owner denied having any conversation with Huggins at the nursery. Further, even if a conversation did take place, EFC had a banking relationship with Owner at the time

Huggins visited Swinton Creek. These are all factors relevant in determining whether there was actual malice.

We conclude the directed verdict should not have been granted and reverse the Court of Appeals on this issue.

### C. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

 Owner argues the trial court erred in granting EFC's motion for directed verdict regarding the claim of breach of implied covenant of good faith and fair dealing. We disagree.

The Court of Appeals affirmed the trial court's determination that Owner could not proceed on his implied covenant of good faith and fair dealing claim because he was in default on the contract. *See Parks v. Lyons*, 219 S.C. 40, 48, 64 S.E.2d 123, 126 (1951) ("one who seeks to recover damages for breach of a contract, to which he was a party, must show that the contract has been performed on his part, or at least that he was, at the appropriate time, able, ready, and willing to perform it."). It is uncontested that in May of 1991, Owner went into default on his note with EFC. We conclude the Court of Appeals is correct on this point.

Owner nevertheless argues that he still has a claim under his contractual relationship with the bank as a stockholder. This argument is without merit because Owner's status as a stockholder is based upon his relationship with EFC as a borrower. And as a borrower, Owner clearly failed to fulfill his obligations under the contract. We therefore affirm the Court of Appeals on this issue.

### CONCLUSION

Based on the foregoing, we **AFFIRM** the Court of Appeals on the issues of invasion of privacy and implied covenant of good faith and fair dealing, but **REVERSE** on the libel issue.

FINNEY, C.J., MOORE, WALLER and BURNETT, JJ., concur.