THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Washington Mutual Bank, FA, Successor to North American Mortgage Company, Respondent,
 
 
 

v.

 
 
 
 Julie A. Hiott, a/k/a Julie A. Stroble, Affordable Homes, Inc., and Mortgage Assurance, Defendants,
 Of whom Julie A. Hiott, a/k/a Julie A. Stroble is the Appellant.
 
 
 

Appeal From Colleton County
 Jackson V. Gregory, Circuit Court Judge

Unpublished Opinion No. 2006-UP-329
Submitted September 1, 2006  Filed September 19, 2006    

AFFIRMED

 
 
 
 Stephan V. Futeral, and Thomas C. Nelson, of Mt. Pleasant, for Appellant.
 Robert J. Thomas, of Columbia, for Respondent.
 
 
 

PER CURIAM:  Julie Hiott appeals the trial courts directed verdict in favor of Washington Mutual Bank (Bank).  Hiott contends the trial court erred in excluding the testimony of her expert witness and in directing verdicts against her claims for unfair trade practices, violation of the attorney preference statute, breach of a forbearance agreement, and the unconscionability of her loan agreement.  We affirm.[1] 
FACTS
In October of 2000, Julie Hiott[2] contacted Affordable Homes, Inc. (Dealer) seeking to purchase a mobile home.  Hiotts fiancé, Dennis Stroble, had informed Hiott that his brother, Donnie Stroble, worked for Dealer and could sell her a repossessed double-wide mobile home at a reduced cost.  Upon arriving at Dealers North Charleston location, a Dealer employee, Raymond Barrineau, informed Hiott that the repossessed double-wide home had been damaged during relocation.  Barrineau told Hiott he would sell her a new double-wide home at his cost because Donnie Stroble worked for Dealer.    
In December of 2000, Hiott selected the mobile home she wished to purchase.  Barrineau contacted a mortgage broker, Mortgage Assurance (Broker), to secure a loan for Hiott.  Hiott and Barrineau completed a mortgage application and sent it to Broker.  Broker arranged a loan for Hiott through North American Mortgage Company which later became a division of Bank.[3]  Hiott received a loan and mortgage for one-hundred six thousand dollars secured by her mobile home and the land on which it was placed.  
In February of 2002, Bank informed Hiott that her loan was in default and allowed her thirty-five days from this notice to repay the default amount.  In June of 2002, Bank offered Hiott a forbearance agreement which she verbally agreed to accept.  A written forbearance agreement offer was sent to Hiott, but she never signed or returned this offer and failed to comply with the specified terms.  
Bank initiated a complaint seeking foreclosure and Hiott answered and counterclaimed for unfair trade practices, violation of the attorney preference statute, breach of a forbearance agreement, and the unconscionability of her loan agreement.  The trial court directed a verdict against each of Hiotts claims and referred Banks foreclosure action to a special referee.  Hiott now appeals.     
STANDARD OF REVIEW
In ruling on a motion for directed verdict, a court must view the evidence and all reasonable inferences in the light most favorable to the non-moving party.  Swinton Creek Nursery v. Edisto Farm Credit, ACA, 334 S.C. 469, 476, 514 S.E.2d 126, 130 (1999).  A directed verdict is properly granted when the evidence yields only one inference.  Id.  In essence, we must determine whether a verdict for a party opposing the motion would be reasonably possible under the facts as liberally construed in his favor.  Harvey v. Strickland, 350 S.C. 303, 309, 566 S.E.2d 529, 532 (2002).  This court will reverse only when there is no evidence to support the trial courts ruling.  Swinton Creek Nursery, 334 S.C. at 477, 514 S.E.2d at 130.    
LAW/ANALYSIS
I.  South Carolina Unfair Trade Practices Act (SCUTPA)
Hiott contends the trial court erred in directing a verdict against her SCUTPA claim.  Hiott argues Bank violated the SCUTPA by failing to fully investigate her financial qualifications and furnishing her with a mortgage she could not pay.  We disagree.
SCUPTA states unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.  S.C. Code Ann. § 39-5-20 (Supp. 2005).  An act is unfair when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is deceptive when it has a tendency to deceive.  Johnson v. Collins Entmt Co., Inc., 349 S.C. 613, 636, 564 S.E.2d 653, 665 (2002).  
Hiott contends Bank should have known her monthly payments were virtually identical to her monthly income, and she could not afford the loan.  However, Bank was provided with a residential loan application and several documents concerning Hiotts financial qualifications which led it to make the loan.  Hiott testified some of these documents contained her valid signature, but on others her signature was forged.  Regardless of the accuracy or truthfulness of the documentation, the following information was provided to Bank:  1)  W-2 tax forms indicating Hiott worked for Daigle Construction and earned $33,619 and $36,188 in 1999 and 2000, respectively,[4]  2)  a gift certification stating Hiotts brother-in-law Dennis Stroble gifted her $6,000,[5]  and  3)  a bill of sale indicating Hiott had sold, through a trade-in, a mobile home to Dealer for $14,000.[6]  Hiott contends Bank should have known the above documentation was false and should not have granted her the loan.
Although Bank was provided with W-2 tax forms indicating Hiott was employed by Daigle Construction, her credit reports did not reflect any record of this employment.  Despite Hiotts assertions to the contrary, Bank, when faced with this conflicting information regarding Hiotts employment, did investigate the validity of the above documentation.  On May 16, 2001, Bank contacted Daigle Construction and was informed by Dennis Daigle, owner of Daigle Construction, that Hiott was currently employed by the company and had been employed for the previous nine years.[7]  While there is evidence tending to support the idea that Banks underwriters could have been more diligent in gaining supporting documentation to follow-up on Hiotts loan application, the record is completely devoid of any evidence to support the assertion the Bank knew the information to be false.  A poor business decision does not necessarily constitute an unfair trade practice.    

 There is no support in South Carolina law for the proposition that a service person violates the unfair trade practice statute if he performs his job poorly or overlooks something which should have attracted his attention. An explicit or implicit representation that he performed his job properly, if the fault is negligence or inattention, is simply not the kind of deceptive practice the statute was intended to reach. 

Clarkson v. Orkin Exterminating Co., Inc., 761 F.2d 189, 191 (C.A.4 (S.C.) 1985).  Banks actions in granting Hiott a loan were based on the false loan application and documentation that it received.  Regardless of who was responsible for producing and providing Bank with this false information, there is no evidence Bank knew the information to be false.  Even if we were to accept as fact that Banks underwriters were negligent and caused Bank to make a bad loan, there is no evidence of any unfair or deceptive acts made by Bank.  Thus, we find the trial court properly granted Banks directed verdict motion.  
II.  Exclusion of Expert Testimony
Hiott contends the trial court erred in excluding her expert witnesss testimony.  Hiott argues her expert would have assisted the jury in understanding complicated banking and underwriting procedures.  We disagree.  
Rule 702, SCRE, governs the admission of expert testimony and states:  If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.  The trial court has wide discretion in determining the qualification of expert witnesses and the admissibility of their testimony, and its decision to admit or exclude such testimony will not be disturbed on appeal absent a clear abuse of that discretion.  Mizell v. Glover, 351 S.C. 392, 406, 570 S.E.2d 176, 183 (2002).  A trial courts ruling on the admissibility of an experts testimony constitutes an abuse of discretion when the ruling is manifestly arbitrary, unreasonable, or unfair.  Fields v. Regl Med Ctr. Orangeburg, 363 S.C. 19, 26,  609 S.E.2d 506, 509 (2005).  
Although prevented from testifying in front of the jury, Hiotts expert, a loan originator, was proffered.  Hiotts expert testified that there were several red flags which Bank should have noticed in processing Hiotts loan.  Taken in the light most favorable to Hiott, this testimony established only that Bank may have been negligent in making a bad loan to Hiott.  We agree with the trial courts assertion that what hes [expert] testified does not amount to an unfair trade practice.  This experts testimony would not have assisted a jury in determining if an unfair trade practice had been utilized by the bank, thus, we find no error. 
III.  Attorney Preference Statute
Hiott contends the trial court erred in directing a verdict against her claim pursuant to the attorney preference statute.  Hiott testified that Bank violated the statute because she did not know she had a right to select an attorney, and her signature on the attorney preference checklist was a forgery.  We disagree.
The attorney preference statute requires creditors of personal loans secured by real estate to ascertain the borrowers preference as to legal counsel prior to closing.  S.C. Code Ann. § 37-10-102 (Supp. 2005).  The statute further explains that a creditor complies with this requirement as long as it gives the borrower notice of the preference information in a manner specified by the statute, such as including it on or with the credit application.  Id.  Section 37-10-105 of the South Carolina Code (Supp. 2005) denotes a creditors liability under the attorney preference statute and states, in pertinent part, as follows:

 (B)  No creditor may be held liable in an action brought under this section for a violation of this chapter if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid the error.

Hiott testified she never saw nor signed an attorney preference sheet and was unaware that she had the right to select an attorney.  However, Bank was provided with a signed attorney preference sheet stating the borrower had no preference of attorney and asking for assistance from the lender.  The attorney preference sheet goes on to state that Hiott  selected an attorney from the list of acceptable attorneys.  This specified attorney was present at the closing.[8]  
Regardless of the authenticity of Hiotts signature on the attorney preference sheet, there is no evidence in the record to indicate any knowledge of wrongdoing by Bank.  Bank was provided with signed documentation which complied with the attorney preference statute.  Bank followed proper procedures to avoid this error, thus, we find a directed verdict against this claim was proper. 
IV.  Forbearance Agreement
Hiott contends the trial court erred in directing a verdict against her claim for breach of a forbearance agreement.  She claims she honored the agreement, but Bank nonetheless attempted to foreclose on her property.  We disagree.  
An agreement is the union of two or more minds in something done or to be done, a mutual assent to do something.  Gaskins v. Blue Cross Blue Shield of S.C., 271 S.C. 101, 105, 245 S.E.2d 598, 600 (1978).   Rules of contract construction exist to determine the parties intention, and the courts, in attempting to ascertain that intention, will seek to determine both the situation of the parties, as well as their goals at the time they entered the contract.  Lindsay v. Lindsay, 328 S.C. 329, 337, 491 S.E.2d 583, 587-88 (Ct. App. 1997).  [A]n agreement that omits material terms may be determined to be unenforceable for indefiniteness.  Id. at 337-38, 491 S.E.2d at 588.
Hiott contends she was orally offered a forbearance agreement in a June 24, 2002 telephone call with Bank.  She contends she accepted this agreement, and the only terms of this oral agreement were that she pay two thousand dollars to Bank by July 12, 2002, with the remaining amount of arrears to be paid within nine months.  Bank asserts this conversation did not complete an agreement.  On June 27, 2002, Bank sent Hiott a written forbearance agreement contract which she was to sign and return.  This written contract included material terms and required Hiott not only to pay monies as noted above, but also required she provide Bank with evidence of sufficient income.  Hiott never signed or returned this contract because, as she testified, she did not have income in the amount required by the contract.   
In support of her assertion regarding the oral forbearance agreement, Hiott entered into evidence a consolidated notes log (log).  This log, compiled by Bank, contains notes regarding Hiotts account and includes notes from telephone conversations.  The log referencing June 24, 2002, states Pre-approved forbearance.  Mortgagor clled [sic] back and it appears that we did find his $1K and have returned it.  Has another $1K now I agree to take $2K down by 7-12 then bal over 9.  Hiott contends the lack of any notes regarding any other terms supports her assertion that there were no additional terms regarding proof of income in the oral forbearance agreement she reached with Bank.    
The evidence viewed in the light most favorable to Hiott would indicate that she and Bank agreed to form an oral forbearance agreement on June 24, 2002, thereby negating any additional terms required by Bank in its June 27, 2004 written forbearance agreement contract.  However, it is patently unreasonable to infer that Bank would accept two thousand dollars in exchange for never foreclosing on Hiotts property regardless of future events.  Further evidence that there was no meeting of the minds on this issue is provided by the written contract Bank sent to Hiott a mere three days after the June 24 telephone conversation.  At best, it does not appear Hiott and Bank shared a meeting of the minds regarding the forbearance agreement.
Further, even were we to assume the June 24, 2002 telephone conversation constituted an oral agreement, this agreement would be unenforceable for indefiniteness.  The agreement, as constituted through Hiotts argument and in the log, lacks material terms such as duration and conditions of Banks agreement not to foreclose.  Bank reduced to writing these necessary material terms in the written contract it provided to Hiott.  Hiott neither signed nor complied with this written contract.  Because we find there was no enforceable forbearance agreement between Hiott and Bank, we find no error by the trial court in directing a verdict against Hiotts claim for breach.  
V.  Unconscionability
Hiott contends the trial court erred in directing a verdict against her claim for unconscionability.  Hiott argues the loan she received was unconscionable because the bank failed to fully investigate her financial qualifications and provided her with a loan they knew or should have known she could not pay back.  We disagree.
Section 37-5-108 of the South Carolina Code (Supp. 2005) outlines factors utilized to determine if unconscionable conduct has occurred and the remedies the court may provide.  Unconscionability has been recognized as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them.  Carolina Care Plan, Inc. v. United HealthCare Services, Inc.,  361 S.C. 544, 554, 606 S.E.2d 752, 757 (2004).  
While the identity of the person or persons who misled Bank is disputed amongst the parties in this action, it is undisputed that Bank was intentionally misled through the use of fraudulent documentation.  Based on this misinformation, Bank supplied Hiott with a loan requiring payments which she could not feasibly afford.  There is no evidence of any unconscionable conduct on the part of Bank.  We find no error by the trial court in directing a verdict against this claim.
CONCLUSION
We find the trial court properly excluded testimony from Hiotts expert witness and properly directed verdicts against Hiotts claims for unfair trade practices, violation of the attorney preference statute, breach of a forbearance agreement, and the unconscionability of her loan agreement.  Based on the foregoing, the trial courts order is
AFFIRMED.  
ANDERSON, KITTREDGE, and SHORT, JJ., concur.

[1]  We decide this case without oral argument pursuant to Rule 215, SCACR.
[2]  In October of 2000, Julie Hiott was engaged to Dennis Stroble, and after the two wed, she became Julie Stroble.  For purposes of this matter, she will be referred to as Julie Hiott. 
[3] For purposes of this matter, actions taken by North American Mortgage Company will be attributed to Bank.
[4] Hiott testified that Barrineau told her he had made up some W-2 forms for her to make it look good at closing.  Hiott has never worked for Daigle Construction.  She cleans homes for a living and usually earns between twelve and thirteen thousand dollars per year.  
[5] Dennis Stroble was actually Hiotts fiancé, and he did not give Hiott the $6,000.  The money was put into Hiotts account by Dealer with the agreement it would be returned to Dealer after the closing.  Hiott tetstified that Barrineau told her that way [you will] look good on [your] account for the banks purposes.    
[6] Hiott testified she did not have a trade-in, and did not sell anything to Dealer.  
[7] Notably, Daigle Construction performed construction work for Dealer. Dennis Daigle owned Daigle Construction and was married to Dealers office manager, Kathy.   
[8] Hiott testified she had not spoken with this attorney prior to closing, and, although he was present at the closing, he did not represent her.